IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:   12-cv-1423

WILLIAM LAWRENCE, and
COLORADO CROSS-DISABILITY COALITION, a Colorado non-profit organization,

      Plaintiffs,

v.

CITY OF ENGLEWOOD, COLORADO, INCLUDING ITS POLICE DEPARTMENT, and
GRAYSON ROBINSON, in his official capacity as Sheriff of Arapahoe County, Colorado,

      Defendants.

---

## COMPLAINT

---

Plaintiffs, William Lawrence and the Colorado Cross-Disability Coalition, by and through undersigned counsel, hereby bring this Complaint against the City of Englewood, Colorado, including its Police Department, and Grayson Robinson, in his official capacity as Sheriff of Arapahoe County, Colorado, for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, *et seq*.

### Introduction

1.     On July 26, 1990, more than twenty years ago, the ADA was passed, establishing the most important civil rights law for people with disabilities in the nation's history.

2.     The ADA was passed to ensure people with disabilities are not discriminated against.

3.      One of the purposes of the ADA is ensuring that deaf or hard-of-hearing individuals receive qualified sign language interpreter services or other auxiliary aids and services to ensure effective communication.

4.      Title II of the ADA specifically applies to public entities, such as the City of Englewood ("Englewood"), the Englewood Police Department ("EPD"), and the Arapahoe County Sheriff's Department ("Sheriff").

5.      As set forth more fully below, Defendants discriminate against Mr. Lawrence, and other deaf and hard of hearing individuals, on the basis of disability by refusing to take appropriate steps to ensure that communications with individuals who are deaf are as effective as communications with others.

6.      Plaintiffs seek a court order compelling Defendants to comply with the ADA and Section 504, monetary damages and the recovery of their reasonable attorneys' fees and costs.

### Jurisdiction and Venue

7.      This Court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      Venue is proper within this District pursuant to 28 U.S.C. § 1391.

### Parties

9.      Plaintiff William Lawrence is and was at all times material hereto a resident of Colorado.

10.      Mr. Lawrence is deaf.

11.      Mr. Lawrence has diabetes, which requires him to use insulin and eat at specific

times.

12.     Mr. Lawrence has other medical conditions, which require him to take other medications and use oxygen at specific times.

13.     Mr. Lawrence is a CCDC member.

14.     Plaintiff Colorado Cross-Disability Coalition ("CCDC") is a Colorado non-profit corporation whose members are persons with disabilities and their non-disabled allies.

15.     Defendant Englewood is a home rule municipality, organized pursuant to the Colorado Constitution, Article XX, and Title 31, Colorado Revised Statutes.   The EPD is a department of Englewood, and is empowered, by The Englewood Municipal Code of 2000, Title 1, Chapter 6, Article I, to oversee all police functions in Englewood including patrol, investigations, administration, community relations, traffic control, and code enforcement, communications and records.

16.     Defendant Grayson Robinson is the Sheriff of Arapahoe County, Colorado, elected and serving pursuant to Part 5, Article 10, Title 30, Colorado Revised Statutes.   The Sheriff also serves as the custodian of the Arapahoe County Detention Facility.   Colo. Rev. Stat. § 30-10-511. Sheriff Robinson is sued in his official capacity as the Sheriff of Arapahoe County, Colorado.

## Facts

17.     In the evening of August 13, 2011, two EPD officers went to Mr. Lawrence's residence to attempt to serve a warrant from Jefferson County, Colorado.

18.     One of those EPD officers was EPD Officer Anita Diaz.

19.     The other officer was an unknown male EPD officer.

20.     When the EPD officers arrived, they initially contacted Mr. Lawrence's landlord, Justin Henry.

21.     On information and belief, one of the EPD officers asked Mr. Henry if Mr. Lawrence was home, and Mr. Henry checked.

22.     A few moments later, Mr. Lawrence went to the door.

23.     On information and belief, during Mr. Lawrence and the EPD officers' interaction, Mr. Henry informed the EPD officers that Mr. Lawrence is deaf.

24.     Mr. Lawrence is deaf and communicates primarily through American Sign Language ("ASL").

25.     ASL is a separate and distinct language from English, which uses its own unique phrases, descriptions, syntax and grammatical rules.

26.     Mr. Lawrence does not speak, read or write effectively in English.

27.     Mr. Lawrence does not effectively read lips.

28.     Mr. Lawrence can write some words and phrases in English, but he does not understand most written communication.

29.     According to Officer Diaz's Inclusive Case Report ("ICR"), Mr. Lawrence matched the physical description of the individual identified in the warrant.

30.     Officer Diaz immediately handcuffed Mr. Lawrence behind his back while the unknown male officer wrote notes to Mr. Lawrence verifying his name and date of birth.

31.     Although the unknown male officer also wrote the word "warrant," Mr. Lawrence was unaware of any outstanding warrants for his arrest, and was unaware of any alleged

underlying criminal activity supporting a warrant.

      32.      Once it became apparent to Mr. Lawrence that the EPD officers intended to place him under arrest in the absence of appropriate auxiliary aids and services, and with his hands cuffed behind his back preventing writing, Mr. Lawrence attempted to vocally communicate to the EPD officers that he would require his medications.

      33.      In the absence of appropriate auxiliary aids and services, Mr. Lawrence was unable to communicate to the EPD officers that he required his medications.

      34.      Mr. Lawrence then attempted to vocally ask Mr. Henry to retrieve his medications.

      35.      Mr. Lawrence and Mr. Henry had lived in the same home for several months, so Mr. Henry had learned to understand Mr. Lawrence's vocalizations.

      36.      After retrieving Mr. Lawrence's medications from his apartment, Mr. Henry gave those medications to the EPD officers.

      37.      According to Officer Diaz's ICR, Mr. Lawrence was then arrested "without incident."

      38.      On information and belief, the only reason the EPD officers went to Mr. Lawrence's home was to attempt to serve the warrant from Jefferson County, and accordingly place him under arrest.

      39.      On information and belief, no emergent or exigent circumstances existed at Mr. Lawrence's home immediately prior to or during the EPD officers' attempt to serve the warrant from Jefferson County, specifically including threats to the safety or welfare of any individual.

      40.      Neither the EPD officers nor any other agent of the EPD or Englewood offered or

provided Mr. Lawrence with a qualified sign language interpreter or any other appropriate auxiliary aids or services for his communications with the EPD officers prior to or during his arrest.

41.     Mr. Lawrence was unable to effectively communicate with the EPD officers in the absence of a qualified interpreter or other appropriate auxiliary aids or services.

42.     On information and belief, Mr. Lawrence's disability was readily apparent to the EPD officers.

43.     The EPD officers then transported Mr. Lawrence to the EPD station for processing.

44.     Although Mr. Lawrence knew he was under arrest at that point, Mr. Lawrence did not know why a warrant for his arrest had been issued and was unaware of where he was being taken.

45.     In the absence of appropriate auxiliary aids and services, Mr. Lawrence was unable to communicate his questions to the EPD officers transporting him regarding the warrant and where he was being transported.

46.     Once at the EPD station, and while still handcuffed behind his back, Mr. Lawrence attempted to vocally ask for a sign language interpreter, but his requests were either not understood by the EPD officers or were ignored.

47.      Shortly after his arrival at the EPD station, Mr. Lawrence's handcuffs were removed and he was provided with a writing utensil and paper for a short period of time.

48.     While Mr. Lawrence had the writing utensil and paper, he attempted to write to the EPD officers that he required a sign language interpreter.

49.    Mr. Lawrence was also feeling the effects of his blood sugar dropping, which he knew required him to eat.

50.    Mr. Lawrence also wrote to the EPD officers that he required something to eat in order to manage his blood sugar, and oxygen due to another medical condition.

51.    The EPD officers either did not understand Mr. Lawrence's written notes or ignored them.

52.    Mr. Lawrence was then placed in a cell and held at the EPD station for approximately two hours.

53.    While in his cell, the EPD officers brought Mr. Lawrence unknown papers for him to sign.

54.    The EPD officers gestured for Mr. Lawrence to sign the papers.

55.    In the absence of appropriate auxiliary aids and services, Mr. Lawrence was unable to read or understand the papers the EPD officers brought him to sign.

56.    Despite not being able to read or understand the papers, Mr. Lawrence signed them because the EPD officers gestured for him to do so.

57.    Mr. Lawrence was never provided with food to manage his blood sugar or oxygen while at the EPD station.

58.    On information and belief, the fact that Mr. Lawrence is deaf was readily apparent to EPD's officers and other personnel at the EPD station.

59.    During the time Mr. Lawrence was at the EPD station, EPD did not offer or provide Mr. Lawrence with a qualified sign language interpreter, access to a telecommunications device,

or any other appropriate auxiliary aids or services.

60.     Mr. Lawrence was unable to communicate effectively with anyone at the EPD station in the absence of a qualified interpreter or other appropriate auxiliary aids or services.

61.     After Mr. Lawrence had been held in the EPD station cell for approximately two hours, he was again handcuffed behind his back and placed in the back of an EPD car with another EPD detainee to be transported to the Arapahoe County Detention Facility ("ACDF").

62.     On information and belief, one of the EPD officers who transported Mr. Lawrence to the ACDF was EPD Officer T. Rowley.

63.     When he was taken to the ACDF, Mr. Lawrence did not know where he was being transported.

64.     In the absence of appropriate auxiliary aids and services, Mr. Lawrence was unable to ask the EPD officers where he was being transported.

65.     On information and belief, Mr. Lawrence's disability was readily apparent to the EPD officers transporting him to the ACDF.

66.     EPD did not offer or provide Mr. Lawrence with a qualified sign language interpreter or other appropriate auxiliary aids or services during his transfer to the custody of the ACDF.

67.     Mr. Lawrence was unable to communicate effectively with anyone during his transfer from the EPD station to the ACDF in the absence of a qualified sign language interpreter or other appropriate auxiliary aids or services.

68.     On information and belief, Mr. Lawrence's disability was readily apparent to the

Sheriff's agents at the ACDF.

69.     On information and belief, EPD officers informed the Sheriff's agents at the ACDF that Mr. Lawrence is deaf.

70.     While Mr. Lawrence was in the booking section of the ACDF, he was given paper and a writing utensil.

71.     Once the Sheriff's agents provided him with paper and a writing utensil, Mr. Lawrence wrote the words "need an interpreter."

72.     One of the Sheriff's agents wrote back to Mr. Lawrence on that same piece of paper, indicating that interpreters are only provided for court.

73.     Mr. Lawrence was then approached by an individual who appeared to be a nurse or medical intake interviewer.

74.     On the Arapahoe County Sheriff's Office Initial Receiving Screening, a medical intake interviewer was identified as "CARTER 07064."

75.     That Initial Receiving Screening form also bears the signature of a nurse, which is illegible, and a "Star #" which is 11006.

76.     The nurse or medical intake interviewer conducted Mr. Lawrence's medical intake interview by writing notes to him and by asking him to answer written questions on a medical intake form.

77.     On information and belief, the fact that Mr. Lawrence is deaf was readily apparent to the nurse or medical intake interviewer.

78.     During his medical intake interview, Mr. Lawrence wrote to the nurse or medical

intake interviewer that he required his medication, food to manage his blood sugar and oxygen.

79.     Mr. Lawrence was feeling the exacerbated effects of his low blood sugar, causing him to feel jittery.

80.     Mr. Lawrence's written notes regarding his medications, food to manage his blood sugar and oxygen were either not understood by the nurse or medical intake interviewer or were ignored.

81.     Mr. Lawrence was never provided with his medications, food to manage his blood sugar or oxygen at the ACDF.

82.     The Sheriff and his agents did not offer or provide Mr. Lawrence with a qualified sign language interpreter or other appropriate auxiliary aids or services during his medical intake interview.

83.     Mr. Lawrence was unable to communicate effectively with anyone during his medical intake interview in the absence of a qualified sign language interpreter or other appropriate auxiliary aids or services.

84.     Mr. Lawrence was booked by the Sheriff's agents, which included photographing and fingerprinting.

85.     The Arapahoe County Sheriff's Office Booking Report, which was completed by hand but was not signed, states that Mr. Lawrence's primary language is ASL.

86.     The Sheriff and his agents did not offer or provide Mr. Lawrence with a qualified sign language interpreter or other appropriate auxiliary aids or services during his booking.

87.     Mr. Lawrence was unable to communicate effectively with anyone during his

booking at the ACDF in the absence of a qualified sign language interpreter or other appropriate auxiliary aids or services.

88.     On information and belief, the fact that Mr. Lawrence is deaf was readily apparent to the Sheriff's agents at the ACDF.

89.     During his detention at the ACDF, Mr. Lawrence also attempted to ask the Sheriff's agents for access to a telecommunications device to make a call.

90.     The Sheriff's agents either did not understand Mr. Lawrence's request or ignored it.

91.     Mr. Lawrence was held at the ACDF for approximately three or four hours, after which time he was transported to the Jefferson County Detention Facility ("JCDF").

92.     At no point during his detention at the ACDF or his transportation to the JCDF did the Sheriff or his agents offer or provide Mr. Lawrence with a qualified sign language interpreter, a telecommunications device, or any other appropriate auxiliary aids or services.

93.     Once the Sheriff's agents transporting him arrived at the JDCF, it appeared to Mr. Lawrence that they were unable to locate the appropriate entrance to the facility.

94.     The Sheriff's agents transporting Mr. Lawrence to the JCDF drove around the JCDF, with Mr. Lawrence handcuffed in the back of the car, for a lengthy period of time before finally stopping to speak with someone.

95.     It appeared to Mr. Lawrence that the Sheriff's agents were asking the individual they stopped to speak with for directions to the appropriate entrance to the JCDF.

96.     While the Sheriff's agents were driving around the JCDF, Mr. Lawrence had identified the appropriate entrance to the JCDF and attempted to relay this information to the

Sheriff's agents.

97.      In the absence of appropriate auxiliary aids and services, Mr. Lawrence was unable to communicate the location of the entrance to the JCDF to the Sheriff's agents.

98.      Because Mr. Lawrence was unable to communicate the location of the appropriate entrance to the JCDF to the Sheriff's agents, he was unnecessarily detained in handcuffs in the back of the Sheriff's vehicle for that lengthy period of time.

99.      Defendants deny access to appropriate auxiliary aids and services for deaf and hard of hearing arrestees and detainees to communicate with their respective officers, agents and employees.

100.      Defendant Englewood has no policies informing EPD's agents and other personnel about providing appropriate auxiliary aids and services to arrestees and detainees who are deaf or hard of hearing.

101.      Defendant Sheriff has policies regarding the provision of appropriate auxiliary aids and services to deaf and hard of hearing individuals, but those policies have not been complied with or enforced.

102.      Defendants have not taken appropriate steps to ensure that communications with deaf individuals are as effective as communications with others.

103.      Plaintiffs, and other deaf and hard of hearing individuals, including members of CCDC, have been harmed, and will continue to be harmed by Defendant Englewood's lack of policies, practices, procedures, and training regarding their obligation to provide appropriate auxiliary aids and services to deaf and hard of hearing individuals.

104.     Plaintiffs, and other deaf and hard of hearing individuals, including members of CCDC, have been harmed, and will continue to be harmed by Defendant Sheriff's failure to ensure compliance with his policies, practices, procedures and training regarding their obligation to provide appropriate auxiliary ands and services to deaf and hard of hearing individuals.

105.     CCDC's purpose is to promote independence, self-reliance, and full participation for people with all types of disabilities, and to combat discrimination against individuals with disabilities, through advocacy, education, research and training.   As a part of that purpose, CCDC seeks to ensure that individuals who are deaf and hard-of-hearing have access to -- and do not encounter discrimination in -- participating in government services, including services while encountering law enforcement officials, and while being arrested, booked, interrogated, and detained.

106.     CCDC engages in extensive outreach as well as advocacy and educational efforts to promote access for and combat discrimination against people with disabilities.   This effort and this purpose have been and continue to be adversely affected by Defendants' violations of the ADA and Section 504.

107.     Defendants' actions have caused and continue to cause distinct, palpable and perceptible injury to CCDC.   Those injuries include, but are not limited to, those described herein.

## First Claim for Relief
(Violations of Section 504)

108.     Plaintiffs reallege and incorporate by reference the remainder of the allegations set forth in this Complaint as fully set forth herein.

109. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), provides in pertinent part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

110. Both EPD and the Sheriff receive federal funding through state and federal programs.

111. In addition, both EPD's and the Sheriff's law enforcement and detention activities constitute the operation of "a department, agency, special purpose district, or other instrumentality of a State or of a local government[.]" 29 U.S.C. § 794(b)(1)(A).

112. Plaintiff Lawrence is a qualified individual with a disability and has been subjected to discrimination by Defendants, as described in this Complaint, solely on the basis of his disability, including the failure to provide auxiliary aids and services in order to ensure effective communication.

113. In the absence of appropriate and enforced policies, practices and procedures, Plaintiff Lawrence and other deaf and hard of hearing CCDC members may be subject to discrimination by EPD and the Sheriff solely on the basis of their disabilities, including Defendants' failure to provide appropriate auxiliary aids and services in order to ensure effective communication.

114. Defendants and their agents acted intentionally and with a reckless disregard for Plaintiffs' civil rights.

14

115.    Plaintiffs have been injured, damaged and aggrieved by, and, in the absence of the injunction requested herein, will continue to be injured, damaged and aggrieved by Defendants' discrimination.

### Second Claim for Relief
(Violations of the ADA)

116.    Plaintiffs reallege and incorporate by reference the remainder of the allegations set forth in this Complaint as fully set forth herein.

117.    Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."

118.    Public entities are defined as "any State or local government; [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]"   42 U.S.C. § 12131(1)(A)-(B).

119.    Defendant Englewood is a public entity within the meaning of the ADA.

120.    Defendant Sheriff a public entity within the meaning of the ADA.

121.    Plaintiff Lawrence is a qualified individual with a disability.   *See* 42 U.S.C. § 12131(2).

122.    Defendant has discriminated against Plaintiff Lawrence on the basis of his disability.

123.    Plaintiffs have been, and will continue to be, injured, damaged and aggrieved by Defendants' discrimination.

124.     In the absence of appropriate and enforced policies, practices and procedures, Plaintiff Lawrence and other deaf and hard of hearing CCDC members may be subject to discrimination by EPD and the Sheriff solely on the basis of their disabilities, including Defendants' failure to provide appropriate auxiliary aids and services in order to ensure effective communication.

125.     Plaintiffs have been injured, damaged and aggrieved by, and, in the absence of the injunction requested herein, will continue to be injured, damaged and aggrieved by Defendants' discrimination.

126.     Defendants and their agents acted intentionally and with a reckless disregard for Plaintiffs' civil rights.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully pray:

1.     That this Court assume jurisdiction;

2.     That this Court issue an Order declaring Defendants to be in violation of Section 504 and Title II of the ADA;

3.     That this Court issue an injunction ordering Defendants to provide qualified sign language interpreters and other appropriate auxiliary aids or services in order to ensure effective communication with deaf and hard-of-hearing individuals;

4.     That this Court awards Plaintiffs damages;

5.     That this Court award Plaintiffs their reasonable attorneys' fees and costs; and

6.      That this Court award such additional or alternative relief as may be just, proper

and equitable.

JURY DEMAND:   Plaintiffs request this case be heard by a jury.

Respectfully Submitted,

> /s/ Kevin W. Williams
> Kevin W. Williams
> Andrew C. Montoya
> Colorado Cross-Disability Coalition
> 655 Broadway, Suite 775
> Denver, Colorado 80203
> Phone: (303) 839-1775
> Facsimile: (720) 210-9819
> E-mail: kwilliams@ccdconline.org
> E-mail: amontoya@ccdconline.org
>
> Attorneys for Plaintiffs

Dated: May 31, 2012

Address of Plaintiff William Lawrence:

4600 S. Inca Street
Englewood, Colorado 80110

Address of Plaintiff Colorado Cross-Disability Coalition:

655 Broadway, Suite 775
Denver, Colorado 80203